IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GEORGE RANDALL WILSON,

      Petitioner,                      2:10 - cv - 3462 - MCE TJB

   vs.

MIKE McDONALD,

      Respondent.                 <u>ORDER, FINDINGS AND</u>

                                          <u>RECOMMENDATIONS</u>

_____/

      Petitioner, George Randall Wilson, is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. At the time he filed his petition, Petitioner was *pro se*. He has since retained counsel. Petitioner is currently serving an indeterminate sentence of 40 years to life in prison after a jury convicted him of two counts of assault with a deadly weapon (a knife and a lamp) and one count of corporal injury upon a spouse. The jury deadlocked on one count of attempted murder. Petitioner raises four claims in this federal habeas petition; specifically: (1) Petitioner's appellate counsel was ineffective for failing to raise certain claims on appeal, specifically the claims raised in this petition ("Claim I"); (2) he is actually innocent of the crime or the evidence adduced at trial was insufficient to support a conviction ("Claim II"); (3) his trial counsel provided ineffective assistance of counsel

by failing to introduce evidence relating to the victim's mental state at the time of the crime and failing to call certain witnesses ("Claim III"); and, (4) the prosecution failed to disclose evidence favorable to the defense ("Claim IV").  For the reasons stated herein, the federal habeas petition should be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

> In January 2004, the victim planned to separate from defendant, her husband. One evening in late January 2004, the victim went to bed alone. In the night, defendant entered the victim's room and stabbed her with a knife. The victim yelled for help. She was bleeding a lot. Defendant then hit her with a lamp and the victim yelled, "that's enough, that's enough." Defendant retorted, "no, you deserve it." As defendant ran down the stairs, he said, " 'I'm sorry. Dang it. Why did I do this,' " and left the house. The victim's daughter called 911.
>
> The victim sustained a laceration on her left inner forearm which penetrated to the muscle and appeared to have been inflicted by a sharp object, such as a knife. She also sustained about an inch deep laceration to her abdomen through the fat under the skin, through the anterior fascia of the abdominal wall, which also appeared to have been inflicted with a sharp object. No broken glass or other foreign objects were found in the wounds.
>
> The victim told paramedics that she had been stabbed while she was asleep. The victim told a police officer that defendant stabbed her while she was sleeping and that he used a knife. At the hospital, the victim told doctors and nurses, " 'He stabbed me, he stabbed me.' " The victim told one of her sons that defendant had stabbed her. At the preliminary hearing, the victim admitted telling officers that defendant had stabbed her with a knife.
>
> In July 2006, two and a half years later, defendant was arrested. The victim visited him 25 times at the jail.
>
> At trial, the victim told a different story, claiming she had a fight with defendant during which she hit him in the back with a lamp, the light bulb broke, and she was cut.
>
> Defendant did not testify, and he called no witnesses to testify on his behalf.

---

[1] The factual and procedural background is taken from the California Court of Appeal, Third Appellate District decision on direct appeal from July 2009 and filed in this Court by Respondent on May 3, 2012 (hereinafter referred to as the "Slip Op.").

2

## II. PROCEDURAL HISTORY

After Petitioner's conviction, he directly appealed to the California Court of Appeal, Third Appellate District. In his direct appeal, Petitioner did not raise any of the claims that he raises in this habeas petition. Petitioner's third claim in this petition, that his trial counsel was ineffective, was initially raised in a motion for a new trial in the trial court. *See* Clerk's Tr. at 350. That motion was denied in a reasoned oral opinion by the trial court. *See* Rep.'s Tr. at 965-73. The remaining claims were raised in Petitioner's petition for habeas corpus in the California Supreme Court, which was summarily denied. *See* Order Denying Petition, California Supreme Court (lodged with the court).

## III. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States. *See* 28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). "The relevant state court determination for purposes of AEDPA review is the last reasoned state court

3

decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). To the extent no such reasoned opinion exists, courts must conduct an independent review of the record to determine whether the state court clearly erred in its application of controlling federal law, and whether the state court's decision was objectively unreasonable. *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "When it is clear, however, that the state court has not decided an issue, we review that question *de novo*." *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*, 545 U.S. 374, 377 (2005)).

## IV. ANALYSIS OF PETITIONER'S CLAIMS

1. Claim II[2]

In Claim II, Petitioner asserts that he is either actually innocent of the crime or that the evidence adduced at trial was insufficient to support a conviction. The trial in this case centered around which version of events the jury chose to believe. Initially, the victim claimed that she had been stabbed by the Petitioner. She told this to her daughter, the police, the paramedics who transported her to the hospital, and the doctors and nurses who attended to her wounds. However, several years later at trial, after visiting Petitioner in prison twenty-five times, the victim recanted this version of the events and instead claimed that she was the aggressor and that she had hit Petitioner with a lamp and that her wounds were the result of a struggle over the lamp. *See, e.g.*, Rep.'s Tr. at 88-89. Petitioner's actual innocence and insufficiency of the

---

[2] Petitioner's first claim, that his appellate counsel was ineffective for failing to raise claims II-IV on appeal, will be addressed last.

evidence claims rest upon the second version the events being true.  Petitioner claims that several declarations of potential defense witnesses, which were filed in state court, prove that he is innocent of the crime.

To the extent Petitioner claims that he is actually innocent, he lacks the clearly established federal law, as determined by the Supreme Court, to support his position. *See* 28 U.S.C. § 2254(d)(2). "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings." *Herrera v. Collins*, 506 U.S. 390, 401 (1993); *see also House v. Bell*, 547 U.S. 518, 555 (2006); *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 129 S.Ct. 2308, 2321-22 (2009) ("Whether such a federal right [to be released upon proof of actual innocence] exists is an open question. We have struggled with it over the years, in some cases assuming, *arguendo*, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."); *cf. In re Davis*, 557 U.S. __, 130 S.Ct. 1 (2009).  Petitioner's actual innocence claim lacks the foundation to support relief under AEDPA. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006).

Even if a claim of actual innocence based upon new evidence would support the issuance of a writ under AEDPA, Petitioner's additional evidence does not prove that he is innocent.  A habeas petitioner asserting a freestanding claim of actual innocence must make a "stronger showing than [the] insufficiency of the evidence to convict" showing adopted by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997).  The required showing must go "beyond demonstrating doubt about [the petitioner's] guilt, and must affirmatively prove that he is probably innocent." *Id.* (citation omitted).  Post conviction evidence serving only to "undercut the evidence presented at trial" does not suffice to meet this standard. *Id.* at 477; *see also Spivey v. Rocha*, 194 F.3d 971, 979 (9th Cir. 1999) (habeas relief unavailable where "the totality of the new evidence does not

5

undermine the structure of the prosecution's case"); *Swan v. Peterson*, 6 F.3d 1373, 1384-85 (9th Cir. 1993) (newly-discovered evidence warrants habeas relief only when it bears on the constitutionality of the conviction and probably would produce an acquittal) (citations omitted).

Petitioner's purported "new evidence" does not meet this high standard. Petitioner's additional evidence consists of: (1) a declaration by a nurse practitioner who saw the victim's wounds at some point after she was released from the hospital and concluded that they were not stab wounds; (2) a declaration by Petitioner's mother who knew the victim at the time of the incident and believed she was "not in her right mind"' (3) a declaration from the victim's daughter describing the victim's behavior near the time of the crime as "erratic" and that she had recently been released from a mental heath institution; and, (4) juvenile criminal records of another daughter who testified at trial. This evidence, at best, may have supported Petitioner's version of the events. However, it does not *prove* he is innocent. If introduced at trial, it would have only been evidence for the jury to consider in determining which version of the events to believe, and would likely have had little effect (*See* Claim III, *infra*). The purported "new evidence" is not sufficient to affirmatively prove that Petitioner is probably innocent. *Carriger*, 132 F.3d at 476.

Petitioner's insufficiency of the evidence claim is equally lacking in merit. The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 at 319. "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). A petitioner for writ of habeas corpus "faces a heavy burden when challenging the sufficiency of

6

the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

In raising his insufficiency of the evidence claim, Petitioner ignores the evidence supporting the prosecution's version of the events. At trial, numerous statements made by the victim shortly after the incident were admitted into evidence. The officer who made initial contact with the victim and interviewed her at the scene while she was being treated by paramedics testified that the victim told him that when she woke up she was being stabbed by the Petitioner with a knife. Rep.'s Tr. at 392-93. Another officer recalled the victim yelling that she had been stabbed by the Petitioner. *Id.* at 484. The victim testified that she repeatedly told someone at the hospital "he stabbed me, he stabbed me." *Id.* at 145. The trauma surgeon who examined the victim at the hospital concluded that she had two visible wounds, one on her arm and one on her abdomen. *Id.* at 319. The wound on the arm was a laceration which penetrated to the muscle and was made by a sharp object. *Id.* The wound to the abdomen also appeared to be made with a sharp object and was approximately three-fourths of an inch deep. *Id.* at 322. No broken glass or any other foreign bodies were found in either of the wounds. *Id.* at 325.

The above is only a small sampling of the evidence introduced at trial which supported the prosecution's theory of the case. Viewing the evidence in the light most favorable to the prosecution, it is a reasonable conclusion that the evidence was sufficient to support the conviction. Though this claim was summarily denied by the California Supreme Court, it is still entitled to deference under AEDPA. *Harrington v. Richter*, __U.S.__; 131 S.Ct. 770, 784-85 (2011). Because the state court's determination was reasonable, Petitioner is not entitled to relief on this claim.

2. Claim III

In this claim, Petitioner alleges that his trial counsel was ineffective for failing to introduce the testimony of three witnesses and for failing to investigate the criminal background of one of the prosecution's witnesses, the victim's daughter. These are the same pieces of

7

evidence Petitioner uses to support his claim of actual innocence. In ruling on this claim on Petitioner's motion for a new trial, the last reasoned decision on this claim, the trial court stated as follows:

> I'm going to deny the motion for a new trial. I do not feel the defense has raised or established a basis which would lead to a conclusion that there's a reasonable probability a different result would occur if this case was retried with the additional evidence being proposed by the defense. I do not feel the issues are sufficient to undermine confidence in the verdict or in the verdicts that were made in this case.
>
> These aren't necessarily in the order of importance, but, as I was organizing my thoughts not too long ago.
>
> First, I have in mind the assertion that developed that Frieda, the daughter, who was – had reached approximately 18 when she testified, that she had, not too long before she testified, been convicted not in juvenile court – not of hit and run driving, but of another violation, but there were facts available, under the Ewoldt principle, for a misdemeanor that would support a hit and run driving, which, arguably, is the crime of moral turpitude.
>
> I agree generally with the proposition the People have made and I have, in fact, reviewed her testimony just in the last 24 hours, and the defense, in crossexamination – of course, she is called as the People's witness, but, in many ways, she was a defense witness. The People needed her on the witness stand to impeach her with incriminating statements given soon after the incident.
>
> But the defense was able to, in a somewhat leading manner – but I'm not saying it wouldn't come out either way – but to establish a number of things; that she is a bright young woman, that she is a good student, that she's a loving daughter to her mother, and that her emotions of that night from her mother being bloodied and injured were normal emotions for a loving child, of anger, and she drew certain conclusions or assumptions from what had happened and reported those, and that she was angry at the defendant and that's why she said these things. And she explained that and how – and then gave her modified version or testimony she gave in court.
>
> Two, she was – I don't know what term to use – she was certainly a presentable witness, and the defense brought out, as much as they had available, to support this theory, that she acted in anger and on assumptions and said things that she knew weren't known to her and maybe weren't accurate, out of anger. This, arguably, is understandable for a loving daughter.
>
> So to then have the defense drag in the fact that, not too long

before, she had rather blatantly left the scene of an accident, I think, would totally detract from the theory that, "She's now credible, she made a mistake in the beginning out of anger and fear and concern for her mother, but, now you can believe her and she is a credible witness." I think that would be counter-productive to her usefulness to the defense. And while witnesses can be, certainly, dishonest and witnesses can be impeached with dishonesty in some other incident, a statement given close in time to an incident, at an emotional event, has some significant credibility, the law recognizes, and juries, I think recognize.

So impeaching her honesty for an incident years after this one just would weaken her usefulness to the defense.

Considerable attention was paid to the description of the wounds suffered by Ms. Crosby. I have, again, reviewed the substantial medical records. There's probably 30 pages. They – and Dr. Jacoby, of course, was the expert witness who testified, who undoubtedly is a very experienced emergency room surgeon, who sees wounds frequently, and, of course, that means he's not likely to have a specific recall of this one, and he is certainly not an amateur, and so he has professional skills and insights.

His use of the phrase, laceration, appears to be at variance to the very technical definition, which I compliment Ms. Hart for locating and figuring out. However, as I mentioned the other day, I have, in multiple, multiple trials, with violent injuries, never heard that distinction propounded or emphasized.

In any event, his definition includes a sharp wound or a cutting wound rather than a tearing wound, and that was his opinion.

His opinions – I'm talking about the arm specifically – and the other wound is commonly referred to in the reports by multiple doctors, not just Dr. Jacoby, but doctors who saw her before she went to Dr. Jacoby. There's at least three or four names signed on to these reports that refer to this body wound as a stab wound.

So I cannot believe that all of those professional physicians would, just because at some point a paramedic quoted a stabbing, would just sign on to that blindly and continue the mistake and support it throughout. So this is not just Dr. Jacoby. We can, from medical records, conclude other doctors made these same observation (sic), and so it's – it's not that weak or unsubstantial or insubstantial.

Ms. Boyer, the nurse, who is a friend, has been a nurse at some point in her career, and I assume has some training and qualifications. However, her value, having observed the arm wound – and I think we can safely conclude she didn't have Ms. Crosby undress for her or it would have been noted or

9

remembered in her memory, that being one of those startling events that registers pretty well – so she looked at the arm wound. We don't know whether it was a week after the incident, two weeks. We have no specific information, but it's in healing mode and she describes it as an abrasion.

Nothing in the medical reports suggests this was a mere abrasion. It might, arguably, because of the ambiguity of the term, laceration, it might, arguably, be a cut that doesn't have perfectly straight edges, but to call it merely an abrasion is totally different than any of the description of the services performed and the treatment given. So that certainly weakens her competence as a qualified person to contradict the medical records in this case.

In addition, the very nature of the observation, the observation of a healing wound with scabbing, is nowhere near as accurate as one observing it before it has modified itself through the healing process. So her opportunity to study this was not ideal, by any means, and, as I say, her impression of abrasion weakens its significance to a great degree.

Now, the other witnesses proposed would be Bobby Wilson, the defendant's mother, referring to a statement given by Shernita, referencing that she attacked the defendant and about her mental instability or – at the period of time, and Bobby Johnson, the daughter of Shernita Crosby, who picked her up at SCMHTC[3] and described her as speaking in tongues, meaning very highly erratic or mentally disordered.

The defense points out that the District Attorney pooh-poohed the suggestion from other sources that she was going through a mental disorder of some level, and, of course, her testimony was that she was hospitalized at SCMHTC for several days and that she had been – gone to one hospital and then transferred to SCMHTC as a mental case.

Now, the – one would expect that, if she – and I don't – the People's comment that no expert came in and corroborated or nobody particularly corroborated this claim seems to be interpreted by the defense to mean that he doubted she even went to SCMHTC. I don't sense that and I don't sense the jurors would doubt that she went to a mental institution. I mean they know how – they can sense how this process works. The District Attorney has impeached one witness after another with things that happened in the past, and, if there – it would be a simple matter to call in someone from SCMHTC to say that woman was never in that hospital during the months of. So I think the fact that that's uncontradicted would cause the jurors to believe she was

---

[3] Sacramento County Mental Health Treatment Center. *See* Rep.'s Tr. at 948-49.

1   hospitalized.

2   But what they need to know, if it's going to be significant to them – what they need to know is how mentally disturbed, what would a
3   professional psychologist or psychiatrist be able to tell the jurors about the nature of her disorder and how it might effect her
4   perceptions. But that's what – of course, it wasn't offered during the trial. But I sense that, if the medical staff had rendered such
5   useful opinions, that they would be presented to the Court at this time, at this Motion for a New Trial, hear from a psychologist, who
6   would strongly assert that she is totally confused.

7   So having your relatives and friends say you're confused, unprofessional, possibly motivated to help out the defendant, I
8   don't think would add very much to the defense of this case. And should that effort be made, then maybe we would have heard from
9   a medical staff. I must assume the medical staff did not find her to be gravely disabled or totally confused. So professionals are better
10  at rendering those opinions than your friends and neighbors and to describing the likely effects of any such erratic behavior.

11
12  If she was speaking in tongues when she left SCMHTC, I'm sure the staff would be able to confirm that in some fashion. And so I
    doubt things were that seriously disordered.
13

14  Now, these witnesses, additionally, report the statement given by Shernita to them fairly early on in these proceedings – I'm not sure
    exactly when – in which she asserted she was the aggressor and the
15  defendant was in a self-defense mode. I do not feel that calling those witnesses and introducing those statements, if they would be
16  termed admissible statements, would have had any likely impact in this case.

17
    Shernita has given numerous statements along the way,particularly,
18  she gave extensive testimony at a preliminary hearing, which is under oath, not only under oath, but it also – we know verbatim
19  what she said. Many times we need to bring out contrary statements because statements that are just heard by a person
20  without recording them and trying to remember what they say, they can get them garbled, and that's why we sometimes find it
21  necessary or one party or another brings out the previous statements to clarify or to support the idea that the statement relied
22  upon by the other party is not accurate. And not having been recorded and being – everybody's memory on such things and
23  statements – in fact, we are cautioned to use statements with some care that aren't recorded because part of the interpretation of
24  the person listening and part of the problem is the person's memory.
25
    So she has given a number of versions of what happened that night,
26  and she's been impeached extensively from earlier statements and

> from the preliminary hearing, which is, as I say, we know is accurate, and I – I don't know that some other statement in time would significantly change or improve her credibility before the jury. Because of the changes, her credibility was not too high. So I don't see that these statements add any significant benefit to the defense or would have the reasonable probability of bringing about a different verdict.
>
> So I have reviewed these matters. I have taken a long time. I won't say I've used all these weeks to study this case only. Obviously, I can't do that. But I have read the material and thought about it, and I'm not persuaded that the defense has met their burden of proof of raising the prospect that a different outcome was – would be reasonably probable in – with this additional evidence presented.
>
> So I deny the Motion for a New Trial.

Rep.'s Tr. at 965-73.

The Sixth Amendment guarantees effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating ineffective assistance of counsel. First, the petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688. Petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See id.* at 690. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the range of professional competent assistance. *See id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Second, a petitioner must affirmatively prove prejudice. *See id.* at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine the confidence in the outcome." *Id.* The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, __ U.S. __, 131 S.Ct 770, 791, 178 L.Ed.2d 624 (2011). A reviewing court "need not determine whether

counsel's performance was deficient before examining the prejudice suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 697). When analyzing a claim for ineffective assistance of counsel where a state court has issued a decision on the merits, a habeas court's ability to grant the writ is limited by two "highly deferential" standards. *Premo v. Moore*, __ U.S. __, 131 S.Ct. 733, 740, 178 L.Ed.2d 649 (2011). "When § 2254(d) applies," as it does here, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *see also Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) ("Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied *Strickland* incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner." (citations omitted)).

The trial court reasonably applied *Strickland* and its progeny in denying Petitioner's motion for a new trial. First, Petitioner claims that his trial counsel should have introduced the testimony of a nurse practitioner who saw the victim at some point after the crime, when the wounds were already healing, and concluded that the wound on the victim's arm was an abrasion and not a laceration. Petitioner fails to show how this would have potentially changed the outcome of his trial. As the state court noted, the victim's wounds were viewed by several medical professionals, including paramedics and doctors. None of these medical professionals, including the trauma surgeon who performed emergency surgery on the victim, concluded that these wounds were mere abrasions, but rather wounds consistent with being stabbed. Petitioner has offered no motive for the surgeon to fabricate his testimony. When this is compared to the a declaration of a nurse practitioner, who was a neighbor of the victim's, and only saw the wound at some point after it had started healing, it is not clear exactly when, it is doubtful that this

would have had any effect upon the jury and the trial court reasonably concluded Petitioner could not establish prejudice.

Petitioner next claims that his attorney should have called his mother to testify. In a declaration in support of his motion for a new trial, his mother stated that "just prior to this incident [the victim] was having mental problems; she was fighting with [Petitioner] and others during this time frame"—the victim was "out of it." Clerk's Tr. at 369-70. As the trial court noted, without more information regarding the alleged mental problems the victim was having, it is impossible to conclude what effect they may have had upon this case. Regardless, even if she was suffering from a mental disease, the prosecution did not dispute she had been to a mental hospital at some point. Rep.'s Tr. at 370. Petitioner fails to show how that relates directly to the events that occurred. At best, the declaration shows that Petitioner's mother would have testified that the victim told her that she was accidentally cut by the lamp at some point in a struggle that she initiated with Petitioner. Clerk's Tr. at 370. However, the victim's credibility, after having told numerous versions of the events that led to her wounds, was irredeemable. It is doubtful that the likely self-serving testimony of Petitioner's mother would have altered the jury's determination of guilt.

Petitioner also claims that his attorney should have had the victim's daughter, Bobbie, testify at trial. In her declaration in support of the motion for a new trial, Bobbie stated that prior to the events at issue in this case, she picked her mother up from the Sacramento County Mental Health Treatment Center. *Id.* at 372. When she picked her mother up she was "speaking tongues" and "was not 'right in the head.'" *Id.* According to the daughter, "no statements my mother made then should have been believed because she was unstable during that time in her life." *Id.* at 373. As with the testimony of his mother, Petitioner fails to establish how the state court's determination that this did not prejudice his defense is objectively unreasonable. Indeed, it is a reasonable conclusion that the victim's testimony at trial was incredible, and that a self-serving declaration by her daughter would not have bolstered her credibility with the jury.

14

Lastly, Petitioner claims that his counsel was ineffective for failing to investigate the victim's mental health problems or call an expert to testify about her mental health. However, Petitioner failed to provide any evidence in state court from which it could be determined what mental problems the victim had, or how they would have potentially affected this case. As such, he fails to show how he may have been prejudiced by any failure to investigate.

Petitioner is not entitled to relief on his ineffective assistance of counsel claim.

3. Claim IV

In claim IV, Petitioner claims that the prosecution violated his constitutional rights by failing to disclose potentially exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Petitioner claims that the prosecution (1) suppressed evidence about the criminal background of one of the prosecution's witnesses, Freida Oliver, who is another one of the victim's daughters and (2) concealed evidence that a piece had come off the broken lamp, which Petitioner claims caused the victim's injuries.

In order to prevail on a claim pursuant to *Brady*, a defendant must demonstrate that: (1) the evidence at issue is favorable, either because it is exculpatory or because it is impeaching; (2) such evidence was suppressed by the State, either willfully or inadvertently; and, (3) prejudice resulted. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Accordingly, the prosecution has "a duty to learn of any favorable evidence known to the others acting on the government's behalf, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). However, even if the prosecution fails to disclose evidence, that evidence must be material, *i.e.*, there must be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682 (1985).

As an initial matter, it is not clear that the prosecution did not disclose the criminal history or that Petitioner's counsel was not aware that Oliver had a criminal history. In Petitioner's motion for a new trial, his new counsel noted that she discovered in trial counsel's files a page from Oliver's juvenile probation report. Clerk's Tr. at 356. California law provides

15

a procedure whereby Petitioner's trial counsel could have retrieved Oliver's juvenile record if necessary, *See* Cal. Welf. & Inst. Code § 827, and as such it was not in the exclusive knowledge or possession of the prosecution.

Regardless of whether the prosecution disclosed Oliver's criminal background to the defense, Petitioner fails to show that he was prejudiced by the alleged failure to disclose. A review of the record shows that Oliver's trial testimony, though she was called as a prosecution witness, was actually beneficial to Petitioner. Oliver testified that on the night her mother was hurt she did not actually see what happened. *See* Rep.'s Tr. at 365-66. When confronted with her previous statements to police that she had observed Petitioner in the room with the victim, Oliver stated that those were only assumptions based on what her mother had told her, and that she did not actually see anything. *Id.* She also testified that she only told the police that Petitioner stabbed her mother because she wanted Petitioner arrested because she was mad at him, not because she believed he had actually stabbed her mother. *Id.* at 364. Petitioner would have benefitted had the jury believed Oliver's trial testimony that her statements at the scene were merely assumptions. Undermining her credibility by impeaching her with her criminal record would have hindered, not helped, Petitioner's case. As such, he fails to show how he was prejudiced by any alleged failure to disclose exculpatory evidence.

In regard to the piece of the lamp that Petitioner alleges caused the victim's injuries, Petitioner fails to show that any such evidence was actually in the possession of the prosecution. The prosecutor cannot disclose what they do not have.

4. Claim I

In Petitioner's first claim, the final claim to be addressed, he claims that his appellate counsel was ineffective for failing to raise claims II, III, and IV on direct appeal. The *Strickland* standard for ineffective assistance of counsel, discussed above in claim III, applies equally to claims of ineffective appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 288-89 (2000). A defendant "does not have a constitutional right to compel appointed counsel to press

16

nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

Petitioner has now had the opportunity to raise his claims in both state and federal court. No court has found Petitioner's claims to be meritorious. While this court has applied the deference required by AEDPA to Petitioner's claims above, the result would be no different if Petitioner's claims were reviewed *de novo*. As such, Petitioner cannot establish that he was prejudiced by his appellate counsel's decision not to raise the above claims on direct appeal. Petitioner is not entitled to relief on this claim.

## V.  REQUEST FOR AN EVIDENTIARY HEARING

Finally, Petitioner requests an evidentiary hearing on his Claims. Pet. at 20. A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate." *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005). A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief." *Earp*, 431 F.3d at 1167 (citations omitted). To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to relief." *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted). In this case, Petitioner's claims are readily determined by the record. Petitioner has not alleged any additional facts that, if true, would entitle him to relief and, therefore, Petitioner fails to demonstrate that he has a colorable claim for federal habeas relief. Moreover, the Supreme Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review. *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398, 1400 (2011). Thus, his request will be denied.

## VI.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary hearing is DENIED.

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: June 20, 2012

_____
TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE